in the U.S. versus Julius. Counsel may proceed. Thank you, your honor, and may it please the court. I'm Peter Henderson. I'm here on behalf of William Julius. I wanted to start by clarifying our position on the first issue we've raised about the expert testimony. Obviously, in our reply brief, we conceded that we cannot actually meet all four prongs of plain error review, but I did want to briefly go over the prongs to ensure the court knew what our position is and what we're trying to preserve. The first two prongs really rely on Wherley, and Wherley decided the issue of expert testimony as it comes to extraction of data off of digital devices. In Mr. Julius's case— I'm sorry, I'm going to jump in right there. Wherley wasn't quite that broad, because there was a footnote that said it didn't pertain to cell phone. Well, that's true, but as you noted in your concurrence, the cases that you relied on to say maybe the majority was wrong about its conclusion in that case all involved cell phones, that distinction didn't make a difference in the analysis, because what we're dealing with are— It didn't make a difference in the analysis, but the Wherley court wasn't dealing with cell phones, so I just think your initial statement was too broad that Wherley applies to all extraction of data from all devices. I understand your argument as to why it would apply to cell phones. I understand why you're arguing that, but I don't think, especially given the footnote from the majority, that we can conclude it does apply to all devices. So, let me be more precise. It applies to the extraction that occurred in this case of the cell phone, given the testimony of the agents. The agents testified that this was reliable data, that the integrity of this data could be relied on, that the agents went through the processes that they had been trained on using the Cellebrite extraction, that they produced a UFDR file, that they tried to extract data using a chip-off extraction on another phone. All of these sorts of topics are the types of technical concepts that the court in Wherley did identify as being properly subject to expert testimony rather than lay testimony. I think the useful way to think about it is there certainly are lay aspects. Plugging in a phone and pressing a button, I think jurors can understand what that means. But if you were then to give that raw data to the jury, I don't think they'd know what to make of it or that they'd be reassured that this is actually the phone's data accurately and without being altered. And if we agree with you, do you agree we're creating a circuit split? Yes, I think you did create a circuit split. I think that that's right, as you identified. If we agree with you, I don't think we created a circuit split before. If we agree with you here, it sounds like you would agree that we are creating a circuit split because the cases were all cell phone cases. And as I said, there was a footnote in the majority that this doesn't apply to cell phone. Well, I suppose you would. I think it was created in Worley. And I think your concurrence was correct in noting that there's no distinction between the USB drive in that case and your typical cell phone extraction, which other circuits have said is not expert testimony. And that's at page 559 of the concurrence. So I think that that's why you concurred. I think you were pointing out to the majority, we need to be careful here because we're sort of silently creating a circuit split. And they put a footnote in that said, well, no, this isn't cell phone. So we need not go there. So yes, if you accept my position, I think it would create a circuit split. But I think really the rationale that you would be adopting is directly from Worley. I don't think there's anything new that the court would be introducing. Of course, the court doesn't necessarily need to... Mr. Henderson, how much overlap was there in the case from the screenshots of Ms. Novak's texts that were obtained and the texts that were admitted from the cell phone extraction? Was there complete overlap, just a little bit of overlap? Because you know where I'm going. Obviously, if the same text came in through a method that you were not challenging, then it would be harmless error at a minimum. My understanding, and I tried to explain in the statement of the case, my understanding was that the texts that came in from Novak's phone were from the other cell phone that couldn't be extracted. In other words, there was no overlap. That was my view of the evidence, was that the texts that came from the extraction were not the same texts that were recovered from Novak's phone. That was not clear from looking at the record, but I'll ask Mr. Koenig the same question. That was not clear to me. It's just my impression, yeah. That's what I discerned from the record. Let me spend a little bit of time... Well, we've conceded that the cases in this circuit are not the same. I'm not going to go into that much because I'd like to talk about the second issue that we've raised. The district court should have permitted Mr. Julius to fully cross-examine and, more importantly, argue the location data point to the jury. This was one of... Mr. Henderson, I'm looking at this transcript and trying to figure out what's preserved. As I understand it, what went into evidence from the testimony was the location information, namely North Clay and 141, and I don't think this is reliable. I didn't see that in the record. I don't understand where this was going next from this record. It's available to be argued, right? No, I don't think it is available to be argued. I think that the fair reading of the district court's sustaining the government's objection is to say this is not reliable evidence. I'm not allowing any because it doesn't have a foundation. It's not reliable, so I'm not going to allow you to continue to talk about this evidence. Indeed, in closing arguments, defense counsel didn't mention the location data even though that sort of... My problem, that is not evident to me from the district court's ruling. Given defense counsel's silence in response to the judge's summary of the unrecorded sidebar, I don't know where he wanted to go. Well, my reading of the transcript and I think that the objection occurs at page 232 and is then sustained. It appears what defense counsel is about to do is to indicate to the jury through his... I want to stop the clock. And then I would expect that that would be the argument. Mr. Anderson, we didn't hear part of your argument. For some reason, it froze out. Could you repeat what you just said? Oh, I'm sorry. We could start the clock again. It was stopped for just a moment. Thank you. Okay. Just to say, it seems apparent to me at least, page 232 of the transcript, that defense counsel is using the location and now attempting through his questions to tie it to the location of the fire to point out these places are far away. And a defense lawyer would do that so that in closing argument, he can get up to the jury and say, look, we've got this location data. Sure, their experts said it was meaningless, but is that enough for reasonable doubt? And by the district court foreclosing any further questions on that topic, basically saying, this whole line of inquiry is inadmissible evidence. You can't talk about the location data. I think it's apparent from the context, but obviously, right, if it's not apparent from the context, then maybe an offer of proof would have been better to preserve this objection. But we certainly think it's preserved. So, Mr. Julius, that's the one piece of exculpatory evidence that really could have helped sow some of the seeds of reasonable doubt. The district court erred in relying on reliability concerns to keep out that evidence. So the court should vacate the judgment. And I'd like to reserve my remaining time, unless you have a question. Thank you, counsel. Mr. Koenig. Thank you, and may it please the court. My name is Jonathan Koenig. I appear on behalf of the United States. I trust you can hear me. Mr. Julius asks you to overturn his convictions for arson on the basis that the district judge failed to qualify the two experts or alternatively, because he disallowed further cross-examination of Mangan about the alleged location of Julius's phone. On the first issue, I would like to answer Judge St. Eve's question. But first, I'd like to argue that it's not necessary to reach the question of whether Wherley requires cell phone extraction witnesses to be qualified as experts, nor is it necessary to create a circuit split. And that's because the appellant's argument so clearly fails on the third and fourth prongs of plain error, as Mr. Henderson admits, at least with respect to the third prong. You had a specific question, Judge St. Eve, about the messages that came in independently of Banelski and Mangan. Those came in in two different ways. The defendant's own letters to his probation officer referenced some of them, and then there were also photographs of NOAC's phone showing some of them as well. And what I couldn't tell, and maybe you're getting there, are these the same messages that were extracted from the officer and the agent, or was this a separate phone? I regrettably can't give you a transcript. My sense is that there was overlap because the content was, are you coming outside? Are you coming outside? He said they sent the same text message five times, as he admitted in one of his letters. So it was either sending the same message from two different phones, or we're talking about the same phone. And I hope that at least partially answers your question on that. It seems like it's unclear from the record, but I think it's the bottom line. And that may be the case. I'd be happy to see if I can find an answer, and if it's there, I would be happy to submit a letter just giving the relevant sites. We'll do that. I'm sorry, Judge? Submit a letter. Thank you. So here, the government did not seek to qualify the experts because there was no controlling precedent requiring them to do so, and indeed out-of-circuit precedent saying that this was not necessary. Do you think Worley is distinguishable, or do you think Worley controls, if we get to that question? I'll be very candid with you. It's hard for me to see a basis for distinguishing cell phones from external hard drives. And I would just note for completeness that the Department of Justice did not seek re-hearing in Worley. So no, I don't see a basis, frankly, for distinguishing them. Of course, if the issue were alive, it might be briefed more fully, but in this case, the government doesn't believe the court even has to reach that question. You didn't seek to qualify the officer or the agent as an expert. Why was the jury instruction given, bringing them in as experts? That's a great question, Judge. I think our disclosure statement kind of laid out all of their qualifications, provided CVs, treated them partially as experts, but then argued they didn't have to be qualified as such. And I think what happened is in the judge's mind, they were experts. And, you know, the government should have been on top of that at jury instruction time. And it wasn't. I did want to say something about the CVs because I think they're very important on a harmless error or a substantial rights analysis. You can't really look at those curriculum vitae, which are docket 39 exhibits C and D. It's difficult to look at those and imagine them not being qualified as experts if we had to do this case over again. So that's really all I want to say about plain error. The fourth problem, this court in Maines recently said, of course, that it has broad discretion to leave even plain errors uncorrected where we have no doubt as to the ultimate result of further proceedings. And I think here, as in Whaley, there's no doubt about the ultimate result of further proceedings. The government could either qualify these witnesses on cell phone extraction or find another witness. What do we do with the cross-examination issue, Mr. Koenig, as Mr. Henderson tells us? The district judge can't really say that I don't think your evidence is reliable, so for the defense, I'm going to keep it out. I'm not sure I'm finding the question that you're asking right now, but I thought the point you made in your previous question was a good one, which is the court disallowed... If we take the position that this was sufficiently evident where Council wanted to go with the cross, at least to make the point that some minutes after the fire started, Mr. Julius was not quite a mile away, why shouldn't that at least be available for argument? Well, it could have been, but the fact that it wasn't doesn't really make a difference. I guess that's the argument that we would make. That's our judicial notice argument. A mile is not a very far distance to traverse on a bicycle, and I did also want to clarify at this point that the link in footnote 10 of our brief appears to have some kind of problem with it, but if you enter 332 South Madison and the intersection of North Clay and Main, which is 141, and then you click on the bicycle icon, you get seven minutes. If you double that figure, if you double that figure to account for drunkenness and the fact that he was driving a mountain bike, you get 14 minutes, which was still doable in the time frame that we're talking about. Yes, we could have argued it to the jury, perhaps we should have, but it's kind of a analysis. Did you take that ride yourself? No, sir. I'm not drunk, certainly. I guess the other thing we would ask you to consider, I've been careful not to say that the government's evidence was overwhelming in this case. I don't think it was an overwhelming evidence case, but there was very strong circumstantial evidence, and if you consider this hypothetical further cross-examination, even in the light most positive to Mr. Julius, it doesn't, and it has to be considered against the backdrop of the agitated and persistent text messages, the stalking, frankly, of Ms. Nowak, the gasoline on his sneakers and socks, even though he did not drive a car, and the lighter found on his person shortly after the second fire, even though he didn't have any cigars or cigarettes with him. So, the government submits that the failure to allow additional questioning about the alleged location was harmless in the context of all of the evidence in the case and not a basis for reversing his convictions. I'd be happy to answer any additional questions that the panel may have. I don't believe there are, Mr. Coyne. Thank you. Mr. Anderson. Thank you, Your Honor, and I'll just answer Judge St. Eve, your question about the two different cell phones. If you look at Exhibit 111, which was actually appended to a defense motion at Document 48 in the record, what the government spreadsheet lays out is that the source of the messages that we have been arguing about comes from the cell phone extraction. It says source type cell phone forensics, and then there are other messages where the source type is the images of Ms. Nowak's phone. So, certainly at trial, all of the messages from the extraction were presented only as being from the extraction. I don't know if the government also has pictures from the phone, but that's what they identified at trial. Thank you. Thank you, counsel. Thanks to both counsel, and the case will be taken under advisement. That concludes the oral arguments for this morning, and I will be with counsel for conference.